UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IONA SANDERS                                    CIVIL ACTION

VERSUS                                          NO. 17-9733

CHRISTWOOD, L.L.C.                              SECTION M (5)

## ORDER & REASONS

Before the Court is the motion for summary judgment of Christwood, improperly named as "Christwood, L.L.C." ("Christwood").[1]   Plaintiff Iona Sanders opposes the motion.[2] Christwood replies in further support of its motion,[3] and Sanders files a surreply in further opposition.[4]  Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons granting summary judgment and dismissing all remaining claims with prejudice.

## I.      BACKGROUND

This matter was brought as a claim of racial discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981, and a claim of retaliation under the Louisiana whistleblower statute, La. R.S. 23:967 ("LWS").  Christwood operates a retirement community consisting of independent living, assisted living, nursing, and memory care units.[5] Sanders, a registered nurse, began her employment with Christwood in September 2008.[6]  Sanders alleges that in March 2015, she accepted a promotion to the position of assisted living unit director

---

[1] R. Doc. 100.
[2] R. Doc. 108.  Sanders subsequently filed two amended oppositions to the motion for summary judgment correcting typographical errors.  R. Docs. 114 & 125.
[3] R. Doc. 121.
[4] R. Doc. 131.
[5] R. Docs. 16 at 2; 52-5 at 4-5; 100-1 at 1-2.
[6] R. Docs. 52-5 at 10-11; 100-1 at 2.

("ALU Director"), which was offered to her by Christwood's associate executive officer, David Cook.[7]   As the ALU Director, Sanders was responsible for the assisted living unit,[8] and she reported directly to Tami Perry, the residential health services director.[9]   On December 4, 2016, Christwood prepared the key personnel paperwork with the State to list Sanders as the ALU Director.[10]

Each Christwood facility is considered an adult residential care provider ("ARCP") which is governed by specific regulations.[11]   In particular, an ARCP "shall report to [the Health Standards Section of the Louisiana Department of Health] any incidents suspected of involving … neglect," and "[t]he initial report of the incident or accident is due within 24 hours of occurrence or discovery of the incident."   La. Admin. Code ("LAC") tit. 48, pt. I, § 6871(B)(2) & (C).   Under Christwood's internal policy, Sanders, as ALU Director, was responsible for this reporting requirement.[12]

On December 19, 2016, an incident occurred in the assisted living unit that was required to be reported to the State.[13]   A female resident suffering with dementia exited the building at 2:33 a.m. and was not helped back inside by staff members until 5:52 a.m.[14]   Her temperature was 90.7 degrees Fahrenheit when she was eventually found between two parked cars.[15]   She was taken to the emergency room to be treated for hypothermia, but was returned to Christwood later that day in good condition.[16]

---

[7] R. Doc. 16 at 2.  Christwood says she was offered the position in November 2016.  R. Doc. 100-1 at 2.
[8] R. Docs. 100-1 at 2-3; 125 at 9-10.
[9] R. Docs. 52-5 at 27, 65; 100-1 at 2-3.
[10] R. Docs. 52-3 at 20; 100-1 at 2; 125 at 9.
[11] R. Docs. 100-1 at 2; 125 at 5.
[12] R. Docs. 52-5 at 191; 100-1 at 3-5.
[13] R. Docs. 100-1 at 3; 125 at 14.
[14] R. Docs. 52-5 at 127; 100-1 at 3-4; 125 at 14.  This type of incident is called an "elopement."
[15] R. Docs. 100-1 at 4; 125 at 14.
[16] R. Docs. 100-1 at 4; 125 at 14.

Sanders attests that on that same morning, Ian Thompson, the nurse on night duty, called Sanders to report the incident.[17]  She claims that he stated he last saw the resident inside at 4:45 a.m.[18]  Sanders went to the hospital to check on the resident.[19]  Sanders says that while she was there the resident's daughter-in-law said Thompson told her that he last saw the resident at 4:45 a.m.[20]  The video footage showed that the resident left the building at 2:33 a.m. and was returned inside at 5:52 a.m.[21]

As the nurse on duty, Thompson was responsible for preparing an incident report.  While Thompson was working on the report, Sanders says she heard Perry tell him, "Stick to what you know, Ian.  Stick to what you know."[22]  Thompson wrote on the nurse's notes attached to his report that he last saw the resident at 2:00 a.m.[23]  Once Thompson completed his incident report, it was signed by both him and Sanders (the "Nurse's Incident Report").[24]  Sanders alleges that she sent the Nurse's Incident Report to Cook for his signature.[25]

Because the incident involved neglect of a resident, a report – both oral and written – was due to the State within 24 hours.  That afternoon Perry called Christopher Vincent of the Louisiana Department of Health to orally report the incident and assure him that a written report would be

---

[17] R. Doc. 52-5 at 123-24.
[18] *Id*.
[19] *Id.* at 125.
[20] *Id*.
[21] R. Docs. 52-5 at 127; 100-1 at 3-4.
[22] R. Doc. 52-5 at 127.
[23] R. Doc. 52-10 at 9.  Thompson wrote: "I'm also not sure of this time, but I think it was around 2:00 a.m. the next morning on the 19th of December.  It might have been later.  I don't remember."  *Id.*  Certified nursing assistants Kim Grainger and Kim Taylor, also on duty that night, were both dismissed for falsifying records when they reported the resident was last seen inside around 4:45 a.m.  R. Docs. 52-5 at 139; 52-10 at 3-6.  Thompson was also disciplined – by Sanders, among others – for his initially inaccurate oral statement of the time he last saw the missing resident indoors, but only with a written warning.  R. Docs. 52-5 at 143-45; 52-12 at 5.
[24] R. Docs. 52-5 at 145; 52-10 at 7-8; 100-1 at 4.
[25] R. Doc. 52-5 at 145-46.

sent to him by lunch-time the next day, December 20, 2016.[26]  Sanders witnessed the conversation and agreed that this phone call fulfilled the state-law requirement to report the incident within 24 hours.[27]

Perry reviewed the Nurse's Incident Report and determined that it did not adequately describe the incident and, for submission to the State, would need to be revised to include more of the facts called for by the state reporting regulation.[28]  She instructed Sanders to redo the report, but Sanders refused on the grounds that, in her understanding, it was illegal to alter an incident report.[29]  Sanders does not dispute that facts were missing from the Nurse's Incident Report, but argues that it would have been more appropriate to supplement the report in the form of a "late entry" or entries in "chronological order."[30]  At 5:06 p.m., Perry emailed Sanders a suggested cover letter and stated: "I would also have Ian [Thompson] come in to complete an Incident Report with your guidance and suggestions.  This must be faxed to Chris [Vincent] before lunch tomorrow since that is what I told him on the phone."[31]

Christwood alleges that on December 21, 2016, a day after the December 20th lunch-time deadline had passed, Sanders called Perry to tell her the report had not been submitted to the State.[32]  Perry reported the lapsed deadline to her supervisor, Cook.[33]  Sanders also called

---

[26] R. Docs. 52-5 at 154; 100-1 at 4.
[27] R. Docs. 52-5 at 154-55; 100-1 at 4.  "I can add that [the elopement incident] was reported within a 24-hour timeline."  R. Doc. 52-5 at 201.
[28] R. Doc. 100-1 at 5.
[29] *Id.*
[30] R. Docs. 125 at 17-20; 131 at 2 & 16.
[31] R. Docs. 52-5 at 149-51; 52-12 at 6-7; 100-1 at 5.
[32] R. Doc. 100-1 at 6.
[33] *Id.*  Perry emailed Cook on December 21, 2016, at 8:22 p.m. stating: "I was just notified by Iona [Sanders] that she has not sent any information to Vincent yet.  This had to be in to him Tuesday before lunch.  She blames this on you having the incident report.  We need to talk about this in the morning."  R. Doc. 52-10 at 13.

4

Thompson to tell him that Perry did not think his report was sufficient for submission to the State and that he should meet with Perry the next day.[34]

On December 22, 2016, Thompson called Sanders after meeting with Perry and asked her what to do.[35]  Sanders told him that "I can't legally tell you to change anything" and advised him that "once a legal document is done, you can't redo it."[36]  However, as she later testified in her deposition, Sanders was not aware of any law that would prohibit an ARCP from retaining the original incident report (the Nurse's Incident Report) and submitting to the State a revised document as the report required by state regulation.[37]

That same day, December 22, Sanders met with Cook and Perry to discuss the incident report.[38]  Notwithstanding the directive Perry had given her on December 19, Sanders explained that no incident report had been faxed to Vincent because she was waiting for Cook's signature on the Nurse's Incident Report.[39]  Cook allegedly returned the unsigned report to her at this time, stating, "It needs to be redone.  I am not sending that."[40]  Sanders said she "knew that this incident report was not a well-documented report, but it's done."[41]  She explained that she could not ask anyone to change an incident report.[42]  Cook responded that he was not telling her to change the incident report.[43]  Perry added: "No one is saying to change the incident report but to state the

[34] R. Docs. 52-5 at 155; 100-1 at 6.
[35] R. Docs. 52-5 at 156; 100-1 at 6.
[36] R. Docs. 52-5 at 156-57; 100-1 at 6.
[37] R. Docs. 52-5 at 157-58; 100-1 at 6;
[38] R. Doc. 52-5 at 171, 343-44.  Sanders says that at this meeting Cook also raised the issue of Sanders's previous failure to be present for the first day of a three-day unannounced visit by the State on September 6-8, 2016. *Id.* at 175.  Cook indicated he should have fired her for that behavior.  *Id.* at 179-80.  But Sanders claims she had previously-approved time off for that visit and Perry told her she would handle it.  *Id.* at 180-81.
[39] *Id.* at 184.
[40] *Id.*
[41] R. Docs. 52-5 at 184; 100-1 at 7.
[42] R. Doc. 52-5 at 185.
[43] R. Docs. 52-5 at 185; 100-1 at 7.

5

facts."[44]   Sanders later testified that she did not believe that Cook and Perry's order to redo the report meant that the Nurse's Incident Report should be destroyed,[45] expressly stating that Perry "never once asked me to destroy the incident report."[46]  Christwood asserts that Cook and Perry told Sanders to meet them the next day, Saturday, December 24, at 10:00 a.m., to properly complete the incident report for submission to the State.[47]

On December 24, 2016, Sanders arrived at Christwood around 2:30 p.m. to discover that Perry, Thompson, and another nurse had already been in that morning to redo the report.[48] Thompson told Sanders that Perry was halfway through rewriting the narrative report when, in frustration, she tore it up and opted to prepare and submit as the state-required report a timeline of events instead (the "Christwood Incident Report").[49]  At 12:17 p.m., Perry emailed the Christwood Incident Report – a timeline of the elopement incident – to Vincent based on her interviews and the video footage.[50]  On December 29, 2016, Sanders says she emailed Perry about sending a letter transmitting the Nurse's Incident Report to the State,[51] but Perry responded that it had already been taken care of.[52]

On Friday, January 27, 2017, Sanders met with Reverend Stephen Holzhalb, Christwood's executive officer, and Perry.[53]  Holzhalb reassigned Sanders to the position of quality assurance coordinator in the skilled nursing unit where she would be responsible for preparing care plans and

---

[44] R. Docs. 52-5 at 185; 100-1 at 7.
[45] R. Doc. 52-5 at 188.
[46] R. Docs. 52-5 at 152; 100-1 at 11.
[47] R. Doc. 100-1 at 6-7.  Sanders says that Perry only stated she would come in on Saturday, without specifying a time.  R. Doc. 52-5 at 185-86.
[48] *Id.* at 195.
[49] *Id.* at 196.
[50] R. Docs. 52-12 at 8-9; 100-1 at 7.
[51] R. Doc. 52-5 at 199.
[52] *Id.*
[53] R. Docs. 52-5 at 209-10; 100-1 at 8.

would retain the same pay and benefits she had as ALU Director.[54]  At her deposition, Sanders agreed that writing care plans was neither degrading nor menial work[55] and that Holzhalb represented to her that the change was not a demotion.[56]  Sanders, however, maintains it was a demotion.[57]

Over that weekend, Sanders did not inform Perry of a staffing shortage that resulted in a delay in delivering medication to some residents.[58]  On Monday, January 30, 2017, Sanders received a letter formalizing her change in position.[59]  In the letter, Christwood cited the lapses in reporting the elopement incident and in the medication delivery over the weekend as the reasons for the change.[60]  Sanders was told to report the following day to begin her new position.[61]  She never returned.[62]  Under Christwood's policy, she was presumed to have resigned.[63]

Sanders filed this suit on September 27, 2017.[64]  On December 5, 2018, Christwood filed a motion for summary judgment,[65] which the Court granted dismissing all of Sanders's claims with prejudice.[66]  Sanders appealed the judgment.[67]  On September 8, 2020, the Fifth Circuit affirmed this Court's dismissal of her discrimination claims, but vacated the dismissal of her whistleblower claims.[68]  The Fifth Circuit explained: "Because the district court concluded that Christwood was

---

[54] R. Docs. 52-5 at 209-10; 100-1 at 8.  Sanders asserts that Holzhalb moved her because he liked the way she prepares documents.  R. Doc. 52-5 at 209-10.  Christwood claims she was reassigned as a result of her failure to properly report the elopement incident.  R. Doc. 100-1 at 8.
[55] R. Docs. 52-5 at 218-19; 100-1 at 8.
[56] R. Doc. 52-5 at 210.
[57] R. Doc. 125 at 27.
[58] R. Doc. 100-1 at 9.
[59] R. Doc. 52-5 at 368.
[60] *Id*.
[61] *Id*.
[62] R. Docs. 52-5 at 223; 100-1 at 10.
[63] R. Doc. 100-1 at 10.
[64] R. Doc. 1.
[65] R. Doc. 52.
[66] R. Docs. 76 & 77.
[67] R. Doc. 78.
[68] R. Doc. 94.

not an employer [under the LWS], it did not address the remainder of the Sanders's LWS claim. In deference to the trial court's responsibility to review the record in the first instance, we vacate the dismissal of Sanders's LWS claim and remand for further proceedings consistent with this opinion as it relates to that claim."[69]  Christwood filed the present summary-judgment motion to address Sanders's remaining LWS claim that she was demoted and constructively discharged for her failure to participate in a violation of state law.[70]  Specifically, Sanders asserts that Christwood contravened state law by causing the incident report to be late in violation of LAC 48.I.6871(F)(1), failing to retain documents in violation of LAC 48.I.6871(F)(6), and falsifying records in violation of La. R.S. 37:921, LAC 46.XLVII.3405, and LAC 46.XLVII.306(T)(8)(i) & (k).[71]

## II.    PENDING MOTION

Christwood argues that Sanders has not made a *prima facie* case for an LWS claim because she cannot show that Christwood actually violated state law.[72]  In the alternative, Christwood asserts that it had a legitimate, non-retaliatory reason for Sanders's change in position, namely, "unsatisfactory job performance."[73]  Finally, Christwood invokes this Court's prior opinion to argue that there is no evidence that Sanders was constructively discharged.[74]  In opposition, Sanders argues that Christwood violated state law when it did not submit the Nurse's Incident Report, without change, to the State.[75]  She asserts that she was retaliated against for her refusal to

---

[69] *Id.* at 13.
[70] R. Doc. 16 at 6.
[71] *Id.* at 4.  In her surreply, Sanders raises new examples of Christwood's purported state-law violations including LAC 48.I.6869(D) & (E) (retention of records) and LAC 48.I.6865(B)(2) (staffing requirements) along with La. R.S. 37:961(4).  R. Doc. 131 at 5 & 16-17.  Because this is the first time these supposed violations are being raised by Sanders, they cannot form the basis of an LWS claim when she is only now informing her employer of them.
[72] R. Doc. 100-2 at 4-14.
[73] *Id.* at 15-18.
[74] *Id.* at 18-21 (citing R. Doc. 76).
[75] R. Doc. 125 at 52.

make Thompson change this report[76] and that Christwood's purported explanations for its actions against her are pretextual.[77]

## III.   LAW & ANALYSIS

### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)).  "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id*.  A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact.  *Id*. at 323.  If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact.  *Id*. at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party.  *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  The substantive law identifies which facts are material.  *Id*.  Material facts are not genuinely disputed when a rational trier of fact could not find for the nonmoving party upon a review of the record taken as a whole.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *E.E.O.C.*

---

[76] *Id.* at 42.
[77] *Id.* at 45-52.

*v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).   Unsubstantiated assertions, conclusory allegations, and merely colorable factual bases are insufficient to defeat a motion for summary judgment.  *See Anderson*, 477 U.S. at 249-50; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994); *Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994).   In ruling on a summary-judgment motion, a court may not resolve credibility issues or weigh evidence.  *See Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).  Furthermore, a court must assess the evidence, review the facts, and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment.  *See Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014); *Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001).  Yet, a court only draws reasonable inferences in favor of the nonmovant "when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little*, 37 F.3d at 1075 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

After the movant demonstrates the absence of a genuine issue of material fact, the nonmovant must articulate specific facts showing a genuine issue and point to supporting, competent evidence that may be presented in a form admissible at trial.  *See Lynch Props., Inc. v. Potomac Ins. Co.*, 140 F.3d 622, 625 (5th Cir. 1998); Fed. R. Civ. P. 56(c)(1)(A) & (c)(2).  Such facts must create more than "some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586.  When the nonmovant will bear the burden of proof at trial on the dispositive issue, the moving party may simply point to insufficient admissible evidence to establish an essential element of the nonmovant's claim in order to satisfy its summary-judgment burden.  *See Celotex*, 477 U.S. at 322-25; Fed. R. Civ. P. 56(c)(1)(B).  Unless there is a genuine issue for trial that could support a judgment in favor of the nonmovant, summary judgment must be granted.  *See Little*, 37 F.3d at 1075-76.

**B. Louisiana Whistleblower Statute**

Under the Louisiana whistleblower statute, "[a]n employer shall not take reprisal against an employee who in good faith, and after advising the employer of the violation of law … [o]bjects to or refuses to participate in an employment act or practice that is in violation of law." La. R.S. 23:967(A)(3). "'Reprisal' includes firing, layoff, loss of benefits, or any discriminatory action the court finds was taken as a result of an action by the employee that is protected under Subsection A of this Section; however, nothing in this Section shall prohibit an employer from enforcing an established employment policy, procedure, or practice or exempt an employee from compliance with such." La. R.S. 23:967(C)(1); *see also Rayborn v. Bossier Par. Sch. Bd.*, 881 F.3d 409, 416 (5th Cir. 2018) ("To show constructive discharge in Louisiana, a plaintiff must show that 'the employer intended to and deliberately created such intolerable working conditions that the employee was forced into involuntary resignation.'") (quoting *Plummer v. Marriott Corp.*, 654 So. 2d 843, 849 (La. App. 1995)); *Kirmer v. Goodyear Tire & Rubber Co.*, 538 F. App'x 520, 528 (5th Cir. 2013) (holding that a service manager's transfer to a different store with the same pay and benefits did not constitute an adverse employment action even though he coincidentally made less in bonuses).

> To state a claim under Louisiana Revised Statutes § 23:967, [the employee] must plead facts sufficient to show that "(1) [the employer] violated the law through a prohibited workplace act or practice; (2) [the employee] advised [the employer] of the violation; (3) [the employee] then refused to participate in the prohibited practice or threatened to disclose the practice; and (4) [the employee] was fired as a result of [her] refusal to participate in the unlawful practice or threat to disclose the practice."

*Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (quoting *Hale v. Touro Infirmary*, 886 So. 2d 1210, 1216 (La. App. 2004)); *see also Diaz v. Superior Energy Servs. LLC*, 341 F. App'x 26, 28 (5th Cir. 2009).

11

"In order to bring an action under La. R.S. 23:967, the employee must establish the employer engaged in workplace conduct constituting an actual violation of state law." *Encalarde v. New Orleans Ctr. for Creative Arts/Riverfront*, 158 So. 3d 826, 826 (La. 2015); *see also Malin v. Orleans Par. Commc'ns Dist.*, 718 F. App'x 264, 273 (5th Cir. 2018) ("To state a claim under [the LWS], an employee must show that his employer retaliated for reporting an actual violation of law."); *Wilson v. Tregre*, 787 F.3d 322, 326 (5th Cir. 2015) ("To qualify for protection under the Louisiana Whistleblower Statute, a plaintiff must prove that his employer committed an *actual* violation of state law.") (emphasis in original) (citing *Ross v. Oceans Behav. Hosp.*, 165 So. 3d 176, 180 (La. App. 2014), and *Mabry v. Andrus*, 34 So. 3d 1075, 1081 (La. App. 2010)).  Reports of "possible" violations of state law are insufficient.  *LaRavia v. Cerise*, 462 F. App'x 459, 464 (5th Cir. 2012).  "A whistleblower claim … requires proof of a causal link between the plaintiff's disclosure of a violation of state law and any acts of reprisal."  *Watkins v. Recreation & Park Comm'n*, 594 F. App'x 838, 843 (5th Cir. 2014).

In her amended complaint, Sanders asserts that the actions taken by Christwood were in violation of LAC 48.I.6871(F)(1) & (F)(6), La. R.S. 37:921, LAC 46.XLVII.3405 and LAC 46.XLVII.306(T)(8)(i) & (k).[78]  Sanders urges that Christwood violated state law when it did not submit the Nurse's Incident Report to the State in its originally-drafted form.  However, none of these regulations requires that the first written report, without change, be the one ultimately submitted to the Louisiana Department of Health.

---

[78] R. Doc. 16 at 4.

### 1. Timely reporting under LAC 48.I.6871(F)(1)

"When an incident … involves abuse or neglect of a resident, or entails any serious threat to the resident's health, safety or well-being, an ARCP director or designee shall immediately report verbally to the director and submit a preliminary written report within 24 hours of the incident to the department … ."  LAC 48.I.6871(F)(1).  "After submission of the initial 24-hour report, a final report shall be submitted within five business days regardless of the outcome."  *Id.* 48.I.6871(D).  Sanders does not dispute that the incident was orally reported to the Louisiana Department of Health, testifying she believed that Perry's phone call satisfied the 24-hour reporting requirement under the law.[79]

The "preliminary written report" required by the regulation – which, here, took the form of the Christwood Incident Report and also constituted the "final report" – was not emailed to the State until December 24, 2016, well after the 24-hour deadline.[80]  The regulation prescribes the eight categories of information to be contained in the report of an incident (including, for example, "circumstances under which the incident occurred; date and time the incident occurred; where the incident occurred"), but it does not prescribe a particular form for the report.  Perry and Cook were concerned that the Nurse's Incident Report, as originally drafted, did not contain all of the "report contents" prescribed by the regulation, leading them to ask Sanders to redo the report and submit it to the State by lunch-time the day after Perry orally reported the incident to Vincent.  Such a submission would have satisfied the 24-hour requirement for a preliminary written report.  Sanders did not heed this directive.  Thus, while the delay in submitting the preliminary written report may

---

[79] R. Doc. 52-5 at 154-55; s*ee also id.* at 201 ("I can add that [the incident] was reported within a 24-hour timeline."), and at 214-15 ("As far as state reporting within a 24-hour period, either the Director or the Director designee call [*sic*] the state.").
[80] R. Doc. 52-12 at 8-9.

constitute a technical violation of state law, it cannot form the basis of Sanders's LWS claim when she herself was responsible, in no small part, for the delay in reporting. *See, e.g.*, *Kite v. Kite Bros.*, 74 So. 3d 1266, 1271 (La. App. 2011) (an employee did not have an LWS claim when he "actively participate[d in], if not orchestrate[d]" the alleged violation of state law). The crux of Sanders's position in this case is that only the Nurse's Incident Report as originally drafted and unrevised – and none other – could be submitted to the State to satisfy the regulatory requirement. Having signed the Nurse's Incident Report and delivered it to Cook, Sanders says she believed she had satisfied her own responsibility for reporting and ignored Perry's instruction to redo the report and submit it to Vincent the day after Perry's oral report to him. Hence, notwithstanding the considerable finger-pointing as to who was at fault for the failure to submit a preliminary written report within 24 hours, Sanders, at the very least, knew a report had not been turned in within the required time frame, and she did not advise Perry of the problem until after the 24-hour deadline had passed. Therefore, Sanders cannot make out a *prima facie* case of retaliation based on this purported violation of state law when she played a role in bringing it about, essentially by neglecting to blow the whistle on herself in time to allow her employer to avoid the violation.

## 2. Retention of documents under LAC 48.I.6871(F)(6)

"When an incident … involves abuse or neglect of a resident, or entails any serious threat to the resident's health, safety or well-being, an ARCP director or designee shall … document its compliance with all of the above procedures for each incident and keep such documentation (including any written reports or notifications) in the resident's file. A separate copy of all such documentation shall be kept in the provider's administrative file." LAC 48.I.6871(F)(6). In her amended complaint, Sanders alleges that the directive to revise the Nurse's Incident Report "required the destruction of the existing Incident Report, resulting in a willful destruction of

14

medical records,"[81] and that "[u]ltimately, Ms. Perry physically destroyed the Incident Report, and did not keep the documentation."[82]

There is no proof that Christwood destroyed documents relating to the elopement incident. At her deposition, Sanders admitted she did not believe that the order to redo the report meant that the Nurse's Incident Report should be destroyed.[83]  Nor was she ever directed to destroy the Nurse's Incident Report.[84]  In fact, the Nurse's Incident Report[85] remains on file at Christwood along with nurses' notes from the night of the incident produced by Thompson,[86] Grainger,[87] and Taylor.[88]

In opposing summary judgment, Sanders makes much of the point that Thompson "stated, 'Tami [Perry] got halfway through rewriting the Incident Report, and then, she tore it up.'"[89]  Even if true, the Court is not convinced that *drafts* of a written report for submission to the State are the kind of documents meant to be preserved under this regulation.  Regardless, Sanders never advised Christwood that destroying such drafts would constitute a violation of state law.  Instead, her argument is that the Nurse's Incident Report, as originally drafted and unrevised, had to be the report submitted to the State because it was a binding legal document and to do otherwise was tantamount to its destruction.  But this dogmatic position finds no authority in the language of §

---

[81] R. Doc. 16 at 4.
[82] *Id.* at 5.
[83] R. Doc. 52-5 at 188.
[84] R. Docs. 52-5 at 152; 100-1 at 11.
[85] R. Doc. 52-10 at 7-8.
[86] *Id.* at 9.
[87] *Id.* at 3-4.
[88] *Id.* at 5-6.
[89] R. Doc. 52-5 at 196.  Similarly, in her amended opposition, Sanders asserts that her own nurse's notes from that night were destroyed.  R. Doc. 125 at 43.  This claim fails because she provides no evidence of the notes, where they might be, or who she turned them over to at Christwood that would have had control over them.  Even assuming this allegation is true, it still cannot form the basis of a whistleblower claim because Sanders never informed Christwood that it was violating state law for the destruction of documents.  In her surreply, Sanders admits that she "was unaware [her] nurses' note [was] no longer in existence until discovery."  R. Doc. 131 at 21.  This is a new attempt at a *post hoc* justification for her whistleblower claim which lacks any evidentiary support.

6871(F)(6), and the Nurse's Incident Report, even assuming it is a legal document under some other authority, remains preserved.  Therefore, Sanders does not have a viable LWS claim based on the alleged violation of LAC 48.I.6871(F)(6).

### 3. Falsification of records under La. R.S. 37:921, LAC 46.XLVII.3405, and LAC 46.XLVII.306(T)(8)(i) & (k)

Nurses can be disciplined when they are "unfit or incompetent by reason of negligence, habit, or other cause."  La. R.S. 37:921(3).  The Louisiana regulatory framework governing the nursing profession lists "falsifying records" as one of the "other causes" for disciplining a nurse.  LAC 46.XLVII.3405(A)(j); *see also id*. 46.XLVII.306(T)(8)(i) (falsifying records) & (k) (delegating nursing tasks to others contrary to regulation).  Sanders alleges that:

> … Mr. Cook and Ms. Perry advised Plaintiff that the report should be altered before submitting it to the state as required.  Specifically, Mr. Cook and Ms. Perry instructed Plaintiff to require the employee nurse to alter his account of the events.  Upon information and belief, the changes sought by Mr. Cook and Ms. Perry would have inaccurately reported the statements of employees at or around the time of the event, among other items. … Plaintiff refused to alter the initial Incident Report, a violation of state law. … Upon information and belief, Defendant submitted an altered document in its place, prepared by another employee, in violation of state law.[90]

There is no evidence in this record on summary judgment that Christwood submitted to the State any records that were falsified in relation to the elopement incident.  When at her deposition Sanders reviewed the final report Christwood submitted to the State, she admitted: "I'm not saying the document is inaccurate."[91]  Instead, Sanders's contention is that submission to the State of any document other than the Nurse's Incident Report, as originally drafted and unrevised, amounted to a falsification of records even if there was nothing false in the report that was submitted.[92]

---

[90] R. Doc. 16 at 4-5.
[91] R. Doc. 52-5 at 205-06.
[92] For example, Sanders argues that "An attempt to rewrite or remodified [*sic*] a signed document with a resident/patient medical information would give the appearance of concealing the initial information contained in the

16

Sanders may well have been taught in nursing school that a patient's records or nurse's notes should not be altered once recorded and that any corrections should be denoted as such, and then only as chronological entries, as she asserts.[93]  But there is no indication in the regulations concerning an ARCP's reporting requirements that a preliminary or final written report to the State cannot be drafted and redrafted before a final product is ready for submission to the State.  This is especially true when earlier documents supplying the raw material for the report – including, here, the Nurse's Incident Report – might have been short on the factual content prescribed by the regulation.  Thus, the prudent act of revising and supplementing early and hurriedly-prepared documentation of an incident for the purpose of submitting a fully-compliant report to the Department of Health hardly amounts to the violation of state law (falsifying records) Sanders alleges.  Sanders simply has not identified any state law or regulation providing that the first draft of an incident report, prepared by the on-duty nurse, must be the preliminary written report or final report submitted to the State under LAC 48.I.6871.[94]

When directing Sanders to revise the report, Perry and Cook explicitly instructed her to provide more facts and context for the elopement incident.  There is no evidence they instructed her to falsify documents.  In her December 22, 2016 meeting with Cook and Perry, Sanders recognized that the Nurse's Incident Report had problems, acknowledging to Cook, "I knew that this incident report was not a well-documented report, but it's done."[95]  Yet, in the face of her

---

original document,"  R. Doc. 131 at 12, and that  "An attempt to rewrite … when the initial document is completed and signed would be consistent with falsifying medical records."  *Id.* at 12-13.

[93] *Id.* at 16.

[94] R. Doc. 52-5 at 219.  In response to a question at her deposition whether it was a violation of law to revise the report, Sanders replied: "That's a question for the Board of Nursing."  *Id.*   In other words, Sanders could point to no state law violated by Christwood's reworking of the Nurse's Incident Report, ahead of any submission to the State, so that the Christwood Incident Report, when submitted to the State, was more complete and hence compliant with the regulation's requirements for its contents.

[95] *Id.* at 184.

acknowledgment, Sanders still told Cook she could not tell anyone to change an incident report.[96]

Cook again stated that he was not telling her to change the incident report prepared by Thompson.[97]

Perry also stated: "No one is saying to change the incident report but to state the facts."[98]

True to these words, the Nurse's Incident Report, as originally drafted, was not altered and remains in Christwood's records. Perry and Cook merely asked Sanders to rework the report into a new document, by adding missing content, before it was submitted to the State as the preliminary written or final report mandated by LAC 48.I.6871. Nevertheless, in response, Sanders has repeatedly and consistently maintained that redoing the report for submission to the State was "illegal," but does so without providing evidence of any state law contravened by such action.[99] On this score, the Fifth Circuit's decision in *Thomas v. ITT Educational Services, Inc.*, 517 F. App'x 259 (5th Cir. 2013), is instructive. In *Thomas*, an instructor could not succeed on her Louisiana whistleblower claim when she only told her supervisors that their direction to accept and give credit for late assignments was "unethical." *Id.* at 263. The court found that she did not provide evidence of an actual violation of state law. *Id.* Similarly, while Sanders disagrees with the course of action chosen by her supervisors, she did not provide proof to them of an actual violation of state law. Nor does she now. Without an actual violation of state law, Sanders has no claim under the Louisiana whistleblower statute.

## IV.   CONCLUSION

Accordingly, for the foregoing reasons,

---

[96] *Id.* at 185.
[97] *Id.*
[98] *Id.*
[99] *See, e.g.*, R. Doc. 131 at 2-4.

IT IS ORDERED that the motion of defendant Christwood for summary judgment (R. Doc. 100) is GRANTED.

IT IS FURTHER ORDERED that the remaining claims of plaintiff Iona Sanders are DISMISSED WITH PREJUDICE.

New Orleans, Louisiana, this 5th day of January, 2021.

_____
BARRY W. ASHE
UNITED STATES DISTRICT JUDGE